### NATCHITOCHES OIL MILL, Inc., v. RUSTON FOUNDRY & MACHINE SHOPS, Limited. *

No. 4705.

Court of Appeal of Louisiana. Second Circuit.

Feb. 5, 1934.

*Rehearing denied March 2, 1934.

Hawthorn, Stafford & Pitts, of Alexandria, for appellant.

Overton & McSween, of Alexandria, for appellee.

DREW, Judge.

This is an action instituted by the Natchitoches Oil Mill, Incorporated, against the Ruston Foundry & Machine Shops, Limited, to recover the sum of $959.50, with legal interest from judicial demand. The claim is represented by the following items:

(1) The cost of three pistons made by defendant for plaintiff for a Fairbanks-Morse engine, and reboring the cylinders of said engine, $384.50; (2) the cost of trimming said pistons down after installation, $23; (3) the cost of installing said pistons, $35; (4) trucking the pistons to and from Alexandria, La., $20; (5) the cost of new cylinder to replace cracked cylinder, $200; and (6) loss of two days' operation of its mill, at $150 per day, $300.

The plaintiff, Natchitoches Oil Mill, Incorporated, owns and operates a cotton oil mill in Natchitoches, La. The defendant is the owner and operator of an iron foundry and machine shop in Alexandria, La. Plaintiff set out that in the summer of 1930 the parties entered into an oral agreement whereby defendant agreed to manufacture for plaintiff three new pistons for use in a 4-cylinder Fairbanks-Morse engine, the price being $384.50; that, in accordance with said agreement, the pistons were manufactured, the cylinders rebored, and the articles delivered and paid for.

Plaintiff alleges that the pistons were improperly constructed and made of faulty material, a fact which it ascertained when it attempted to use the engine in which they were installed; that, after continually sticking in the cylinders, the three pistons finally, one by one, cracked and broke down, and became totally worthless and were returned to defendant.

This suit was then filed for the return of the cost price and for other items, as above alleged, including the value of a cylinder which was wrecked by one of the pistons, delays in operation caused thereby, installation costs, and expenses, etc., making the total amount claimed herein.

The defense stated that the pistons were properly made of good material, and that the cylinders were rebored in a workmanlike manner, and that the trouble which plaintiff had with the pistons was due to . the manner in which the engine was used and operated.

The lower court rendered judgment in favor of defendant, and plaintiff has appealed.

In the summer of 1930 plaintiff ordered from defendant three new pistons for its 4-cylinder Fairbanks-Morse engine. Only three were ordered for the reason that it had on hand one unused piston made by the Fairbanks-Morse Company. The three pistons were delivered in July, and were installed in the engine by plaintiff's engineer. Soon thereafter the engine, carrying no load, was started up, and it was found that the three pistons made by defendant were slightly too large. To rectify this, the pistons were dressed down, or made slightly smaller, by cutting off in a lathe $\frac{1}{32}$ of an inch from each side, starting at the top of the third ring and tapering to the top or head of the piston. The bill for this work, amounting to $23, was sent to defendant on August 22d, soon after the work was done, and plaintiff was credited with that amount. The defendant, therefore, ratified what was done by plaintiff.

After this was done, no attempt was made to use the engine until the latter part of August or the first part of September, when the mill started up for the crushing season. It seems that, after two or three days' usage, the pistons swelled again to such an extent that the engine stopped and could only be started again by allowing the pistons to cool off and contract; that continually during the next two months the pistons gave trouble, sticking first in one place and then another, despite plaintiff's efforts to trim them off with an emery wheel and in a lathe; and that finally they cracked and became useless and were returned to defendant.

The plaintiff's theory of the trouble, viz., what caused the pistons to stick from time to time, is best shown by the testimony of C. L. Hayne, an officer of the plaintiff corporation, a graduate of the Engineering School of Louisiana State University, and a practical engineer and mechanic of many years' experience. His testimony on this point is as follows:

"Q. What caused those pistons to stick, Mr. Hayne? A. I think Mr. Dawkins hit the nail on the head when he said green pistons; they sent material up there, in my opinion, which was unseasoned; it was entirely different material from the cylinder wall. They had no unequal expansion and contraction. The pistons expanded more than the cylinder walls did and the green castings continued to grow and as fast as we got them down, they would continue to grow and they finally cracked up.

"Q. Did Mr. McMichael know these pistons were to be used in that particular engine? A. He did. I called on Mr. McMichael, Mr. Day and myself, and told him that

the Fairbanks-Morse man, representative, predicted the very thing that did happen and he laughed at that suggestion. The Fairbanks-Morse man stated that these pistons were going to give trouble, that they couldn't make pistons for Fairbanks-Morse engines, and Mr. McMichael laughed at that suggestion in his office and said, 'we can make pistons for anybody,' and they did and just exactly as the man said they would.

"Q. From your knowledge as a practical engineering mechanic, do you think you are in a position to state why those pistons expanded and caused the trouble? A. Cast iron is similar to lumber in that in a lumber mill you find dry kilns and lumber stacked out in the woods for the purpose of seasoning the lumber, and in big foundries you find castings thrown out in the yard to season, to be seasoned by the atmosphere. Some plants have electric ovens similar to a dry kiln in a lumber mill. These cast iron materials are not good until they are properly seasoned for a period of probably six months or maybe a year, the longer the better. When it's not a properly seasoned casting, it's called a green casting, and they will continue to grow. The cylinder walls of this Fairbanks-Morse engine were seasoned material and we tried to match up unseasoned material with seasoned material. It's similar to a blood transfusion; the analysis of that material might be perfect from an analysis standpoint, but it would not analyze with the walls of that cylinder; my blood might be perfect but it might not fit this man's blood in a transfusion."

Professor Lacy H. Morrison, in his work entitled "Oil Engines," a recognized authority, says: "It is apparent that piston seizing when it is due to lack of clearance can be eliminated by taking a small taper cut off the piston immediately below the head. The taper may well start between the top pair of rings. Certain cast irons continue to grow even after the clearance has been increased by such a cut. It then becomes necessary to watch this piston and repeat the tapering process as required." (Pages 72 and 73 of the above-mentioned work.)

On page 72 of the same work Professor Morrison has the following to say: "Even with the the modern types of pistons now in use, many plants have experienced trouble with seized pistons. This difficulty is directly traceable to either of two conditions. One of these is insufficient clearance between the piston and liner. This applies especially to the clearance around the piston immediately below the head. The temperature of the piston head must run very high to establish a heat balance wherein the heat thrown off equals the heat absorbed by the piston. This heat condition causes the head to expand diametrically. If there is insufficient clearance between the head and cylinder walls, seizing will occur. To obviate this the piston can be slightly tapered, with a decreasing clearance downward toward the piston pin. The maximum clearance can be as great as $\frac{1}{16}$ inch, while the clearance in the neighborhood of the first piston ring should be approximately .007 inch. Another solution of head expansion is found in the conical piston head. This conical surface possesses ample side clearance for expansion. Incidentally, the conical head assists in the thorough intermingling of the air and atomized fuel as they leave the injection valve. The same relief from seizing is attained by the dished or concave head. This design of head also serves as an aid in mixing the air and fuel."

With any metal, particularly cast-iron pistons, it seems that the piston, when used in a motor, is subjected to much heat and, despite lubrication and water cooling, it will expand as it gets hot. This expansion is taken care of by a clearance between the piston and cylinder. The clearance in an engine the size of the one involved here is ordinarily from 14/1000 of an inch to 20/1000 of an inch at the head of the piston, which is subject to more heat than the remainder of it is. If the piston is properly made and of seasoned material, when it cools off it will contract to the same size and shape as it was before expanding, but, when made of green, or unseasoned, iron, after expanding and cooling off, it will not always contract to the exact size and shape. If it does not, when the engine is started again, the piston will stick. Where the regular clearance is so slight, it can readily be seen how the slightest warping would cause the piston to stick. We think this is exactly what happened, as it is shown by the testimony that the greatest amount of trouble was had with the sticking of the piston on Monday morning, after the engine had been shut down over Saturday night and Sunday. All other days it ran both night and day.

It is certain from the testimony that plaintiff had continuous trouble with the three pistons manufactured by defendant from the first day it attempted to use them until some four months later, when they gradually became worthless and were returned to defendant. It is also significant that the fourth piston, which was furnished by the Fairbanks-Morse people, was being used at the same time in the same engine and under the same conditions, yet it never gave any trouble, and was continued in use in the same engine during the remainder of the grinding season and the following season. It is also significant that the three pistons furnished by the Fairbanks-Morse Company to replace the three furnished and manufactured by the defendant have never given any trouble of any kind at any time.

It must be borne in mind that, before plaintiff ordered the pistons from defendant, it informed the head of defendant company that the Fairbanks-Morse people said defendant could not manufacture pistons which would work satisfactorily in the engine owned by plaintiff, at which statement defendant's manager scoffed and laughed and assured plaintiff that it could manufacture pistons which would be satisfactory. The pistons manufactured by it were anything but satisfactory, and were completely done for in about four months, when it is admitted that a piston should last for five years.

Defendant did not analyze the material used in making the pistons until after they were returned to it, when it had an analysis made by one of the employees of the Louisiana highway department, whose report shows the metal used in the pistons to have been the best grey iron. Defendant further shows that, after the castings were made and the pistons roughened out, they were put through the ordinary seasoning process, which consisted of bringing them to a red heat, then cutting off the fire under the furnace and allowing them to cool slowly. The pistons were then finished to the proper size. The cylinders were rebored and the pistons fitted in. It contends under this showing that its work was proper, the material was the best and it was properly seasoned, and the reason the pistons did not give proper service was due to the fault in installing them in the engine by plaintiff's mechanic, to faulty lubrication or improper water cooling.

Plaintiff conclusively shows that the installation was perfect, the lubrication was proper, and the water-cooling system also perfect.

It is further contended by defendant that plaintiff ground off too much of the pistons when it took off $\frac{1}{32}$ of an inch on each side of the head of the piston, and by doing so allowed too much clearance, and that the combustion therefore burned up the oil the pistons were getting, and caused them to become overheated. This theory is done away with when it is shown that the rings which were not reduced in size formed a perfect seal to prevent such an occurrence.

We might take all the testimony offered by plaintiff and defendant consisting of the best expert testimony available, and then be at an entire loss to account for the pistons sticking. However, we have an undisputed fact, which is that the pistons did stick and gave trouble from the beginning and were completely done for in about four months. The only way to account for the trouble is on the theory advanced by plaintiff that the pistons were made of green material. And, although the method of seasoning used by defendant was the ordinary method, it was not sufficient in this particular instance. We are convinced that the pistons became warped after becoming heated and expanded, and then allowed to cool.

Defendant was put on its guard when the order was given for the pistons. It was incumbent on it to know that they were perfectly seasoned and would perform the work they were manufactured to do, and, since defendant was the manufacturer of the pistons and responsible for them, it is liable for all damage caused to plaintiff by or through the defective pistons.

There is no contest over the amount plaintiff paid out, due to the pistons being defective.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court is erroneous and is reversed; and there is now judgment in favor of plaintiff, Natchitoches Oil Mill, Incorporated, and against defendant, Ruston Foundry & Machine Shops, Limited, in the sum of $959.50, with legal interest from judicial demand until paid, and all costs of this suit.

*Rehearing denied March 2, 1934.